NO. 22-14128-B

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

v.

YNDDY BLANC,

*Defendant/Appellant.*

———————

On Appeal from the United States District Court
for the Southern District of Florida

———————

BRIEF OF THE APPELLANT
YNDDY BLANC

———————

MICHAEL CARUSO
Federal Public Defender
MARGARET Y. FOLDES
  Assistant Federal Public Defender
  Attorney for Appellant
  One E. Broward Blvd., Suite 1100
  Fort Lauderdale, Florida 33301
  Telephone No. (954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Ynddy Blanc
### Case No. 22-14128-B

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Ajlani Macri, Huda. Assistant Federal Public Defender

Anton, Jodi, Assistant United States Attorney

Blanc, Ynddy, Defendant

Caruso, Michael, Federal Public Defender

Cohn, Honorable James I., United States District Judge

Foldes, Margaret, Assistant Federal Public Defender

Gonzalez, Juan Antonio, Former United States Attorney

Hapner, Adam M., Assistant United States Attorney

Hunt, Honorable Patrick M., United States Magistrate Judge

Koontz, M. Catherine, Assistant United States Attorney

Lapointe, Markenzy, United States Attorney

Matzkin, Daniel, Chief of Appellate Division, United States

    Attorney's Office

Smith, II, Jan C., Assistant Federal Public Defender

Strauss, Honorable Jared M., United States Magistrate Judge

United States of America, Plaintiff/Appellee

Wilcox, Daryl, Former Assistant Federal Public Defender

Zloch, William T., Assistant United States Attorney


        _s/Margaret Y. Foldes_
        Margaret Y. Foldes

## STATEMENT REGARDING ORAL ARGUMENT

The defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CITATIONS ........................................................................iii

STATEMENT OF JURISDICTION........................................................ 1

STATEMENT OF THE ISSUES.............................................................. 2

STATEMENT OF THE CASE .................................................................. 3

Course of Proceedings and Disposition

in the District Court.................................................................. 3

Statement of the Facts .............................................................. 5

Standards of Review................................................................... 37

SUMMARY OF THE ARGUMENT ...................................................... 38

ARGUMENT AND CITATIONS OF AUTHORITY ............................. 41

I.   The Court Reversibly Erred When It Permitted Improper
     §404(b) Evidence.............................................................. 41

     A.  The Government Violated the First and Third Prongs of
         the Three-Part Test Governing Admissibility of Extrinsic
         Evidence Pursuant to Fed. R. Evid. 404(b) .............................. 42

     B. The Evidence Was Not Admissible Under the Inextricably
        Intertwined Doctrine ................................................. 47

ii

II. The Court Reversibly Erred Under Rule 403 When It Admitted Unduly Prejudicial Child Pornography Video Clips Into Evidence In Lieu of the Defendant's Stipulations ........................... 48

III. The Court Reversibly Erred When It Permitted Improper and Unreliable Lay Opinion Testimony ................................................. 51

IV. The Court Reversibly Erred When It Permitted Improper Closing Argument and When It Failed to Grant a Mistrial ............ 54

V. Cumulative Error Requires Reversal .............................................. 56

VI. The Evidence Adduced at Trial Was Insufficient to Prove Beyond a Reasonable Doubt that Blanc Was Guilty of the Charges in the Indictment ............................................................... 57

VII. Blanc's Sentence Should Be Reversed ........................................... 59

A. The Number of Images Attributed to Blanc Under U.S.S.G. §2G2.2 Violated *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) and *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) ....... 59

B. Blanc's Sentence Is Substantively Unreasonable ...................... 63

CONCLUSION ....................................................................................... 68

CERTIFICATE OF COMPLIANCE ....................................................... 69

CERTIFICATE OF SERVICE ................................................................ 70

# TABLE OF CITATIONS

**CASES:**

*Alleyne v. United States,*

    133 S. Ct. 2151 (2013) .......................................................................... 66

*Apprendi v. New Jersey,*

    530 U.S. 466 (2000) .............................................................................. 66

*Auer v. Robbins,*

    519 U.S. 452, 117 S. Ct. 905 (1997).................................................... 60

*Blakely v. Washington,*

    542 U.S. 296 (2004) .............................................................................. 66

*Bowles v. Seminole Rock & Sand Co.,*

    325 U.S. 410, 65 S. Ct. 1215 (1945).................................................... 60

*Davis v. Zant,*

    36 F.3d 1538 (11th Cir. 1994) ............................................................. 55

*Gall v. United States,*

    552 U.S. 38 (2007) ........................................................... 37, 59, 63-64

*Kimbrough v. United States,*

    552 U.S. 85 (2007) ................................................................59, 63-64

*Kisor v. Wilkie,*

    139 S.Ct. 2400 (2019) ................................................................60-61

*Michelson v. United States,*

    335 U.S. 469 (1948) ................................................................41, 44

*Old Chief v. United States,*

    519 U.S. 172 (1997) ................................................................50-51

*Rita v. United States,*

    551 U.S. 338 (2007) ................................................................66-67

*Stinson v. United States,*

    508 U.S. 36, 113 S. Ct. 1913 (1993)............................................60, 62

*United States v. Baker,*

    432 F.3d 1189 (11th Cir. 2005) ........................................................56

*United States v. Beechum,*

    582 F.2d 898 (5th Cir. 1978) ................................................................42, 44

*United States v. Booker,*

    543 U.S. 220 (2005) ..................................................... 59, 66

*United States v. Caldwell,*

    760 F.3d 257 (3d Cir. 2014) ....................................... 42, 46

*United States v. Campbell,*

    22 F.4th 438 (4th Cir. 2022) ............................................ 37

*United States v. Cano,*

    289 F.3d 1354 (11th Cir. 2002) ....................................... 52

*United States v. Cardenas,*

    895 F.2d 1338 (11th Cir. 1990) ....................................... 43

*United States v. Chilcote,*

    724 F.2d 1498 (11th Cir. 1984) ....................................... 47

*United States v. Dupree,*

    57 F.4th 1269 (11th Cir. 2023) ............................ 40, 59-62, 64

*United States v. Eckhardt,*

    466 F.3d 938 (11th Cir. 2006) ......................................... 55

*United States v. Fulton,*

    837 F.3d 281 (3d Cir. 2016) ............................................................ 52

*United States v. Hands,*

    184 F.3d 1322 (11th Cir. 1999) ...................................................... 45

*United States v. Lopez,*

    590 F.3d 1238 (11th Cir. 2009), *cert. denied,*

    131 S. Ct. 413 (2010) ........................................................................ 54

*United States v. McLain,*

    823 F.2d 1457 (11th Cir. 1987) ...................................................... 56

*United States v. Merino-Balderrama,*

    146 F.3d 758 (9th Cir. 1998) .......................................................... 51

*United States v. Miller,*

    959 F.2d 1535 (11th Cir. 1992) ...................................................... 42

*United States v. Murray,*

    103 F.3d 310 (3d Cir. 1997) ............................................................ 46

*United States v. Obregon,*

    893 F.2d 1307 (11th Cir. 1990) ...................................................... 54

*United States v. Riccardi,*

    989 F.3d 476 (6th Cir. 2021) ............................................................. 62

*United States v. Utter,*

    97 F.3d 509 (11th Cir. 1996) ............................................................. 46

# STATUTORY AND OTHER AUTHORITY:

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 3742 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................ 1

U.S.S.G. § 2G2.2 ......................................................... 34, 59, 62-63

U.S.S.G. § 2G2.2(b)(7) ..................................................... 61, 63

Fed. R. Evid. § 403 ........................................ 8, 41-42, 44, 46, 48, 50-51

Fed. R. Evid. 404(a) ......................................................... 42, 45

Fed. R. Evid. § 404(b) ........................................................ *Passim*

Fed. R. Evid. § 701 ...................................................... 39, 51-53

Fla. Stat. § 847.0135(4)(A) ...................................................... 6

University of Mississippi, *Judicial Guide: A Judge's Guide to Exposure to Child Pornography for Court Personnel and Jurors*, <https://olemiss.edu/depts/ncjrl/pdf/I%20C%20A%20C/2013%20-%20April%2018-19/06d%20-%20Judicial%20Guide.pdf> (accessed July 22, 2023) ......................................................... 49

# STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States. This court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was filed on December 13, 2022, from the final judgment entered on December 1, 2022, which disposes of all claims between the parties to this cause.

# STATEMENT OF THE ISSUES

I.   The Court Reversibly Erred When It Admitted Improper 404(b) Evidence.

II.  The Court Reversibly Erred Under Rule 403 When It Admitted Inflammatory Video Clips into Evidence In Lieu of the Defendant's Stipulations.

III. The Court Reversibly Erred When It Permitted Improper and Unreliable Lay Opinion Testimony.

IV.  The Court Reversibly Erred When It Permitted Improper Closing Argument and When It Failed to Grant a Mistrial.

V.   Cumulative Error Requires Reversal.

VI.  The Evidence Adduced at Trial Was Insufficient to Prove Beyond a Reasonable Doubt that Blanc Was Guilty of the Crimes Charged.

VII. Blanc's Sentence Should Be Reversed

   A. The Number of Images Attributed to Blanc Under U.S.S.G. §2G2.2 Violated *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023); and *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019).

   B. Blanc's Sentence Was Substantively Unreasonable.

# STATEMENT OF THE CASE

The appellant was the defendant in the district court and will be referred to by name or as the defendant. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document number as set forth in PACER. The defendant is incarcerated.

## Course of Proceedings and Disposition in the District Court

Blanc was arrested on January 20, 2022, at the Fort Lauderdale airport, when he returned from a trip to Haiti. He is a citizen of Haiti and a permanent resident of the United States; he has family in Florida. (PSR ¶54). Upon arriving from Haiti, Blanc was referred to a secondary inspection. A Customs and Border Patrol (CBP) inspector searched Blanc's cell phone and found a child pornography video that had been downloaded onto Blanc's phone in WhatsApp. Blanc was subsequently indicted for knowingly transporting and knowingly possessing child pornography in violation of 18 U.S.C. §2252(a)(1) and (a)(4)(B).

Blanc defended on the ground that the videos on his phone were automatic downloads from the WhatsApp program that he did not know about. He had only owned the phone for approximately 3 months. A forensic exam by the government revealed that a massive stream of data had been downloaded by WhatsApp onto Blanc's phone over the three month period of time, and that only .3% of that data was child pornography.

Before trial, the government filed a notice that it intended to present evidence of a prior arrest that Blanc had pursuant to Fed. R. Evid. 404(b). (DE 32, DE 33). Blanc opposed this evidence, but after a hearing, the court ruled in favor of the government, thus permitting the §404(b) evidence to be presented at the trial.

Blanc also submitted a motion *in limine* for a trial stipulation. (DE 35). He proposed to stipulate that the videos at issue constituted obvious child pornography, and he proposed that this stipulation would obviate the need to play the videos at trial. (DE 37). The government opposed the stipulation, and the court ruled that the government could play the video clips at trial.

Blanc's original trial began June 7, 2022. On day four of the trial, the jury deliberated. After seven hours of deliberations, the jury informed the court that it was deadlocked. The parties agreed to a mistrial which was granted, and the jury was discharged. (DE 44, 45). A new trial was set for September 2022. (DE 54).

The new trial commenced on September 12, 2022, and ended on September 14, 2022. (DE 66). At this second trial, the government led off with the §404(b) evidence, and it also played the video clips of the child pornography to the jury. The jury ultimately found Blanc guilty of both counts of the indictment.

After trial, Blanc was sentenced. The court overruled Blanc's objections to the Presentence Investigation Report (PSR) and denied his request for a downward variance. It sentenced Blanc to 168 months imprisonment. Blanc filed a timely notice of appeal.

## Statement of the Facts

## I. The §404(b) Motion

With respect to the §404(b) evidence, the government proposed to introduce evidence of an arrest that had occurred on April 26, 2021,

before his trip to Haiti, in which Blanc was charged with traveling to meet a minor in violation of Fl. Stat. §847.0135(4)(A). (DE 32, DE 33). There was no conviction for this incident as the case was still pending and had not been resolved by the State of Florida. The government stated that the case involved an undercover officer who operated a Facebook page posing as a fictitious 14-year-old girl. (DE 115:2-3). The government argued that this evidence went to Blanc's knowledge and intent because it showed that Blanc had a "sexual interest in children," thus making it more likely that the defendant knew about and purposely retained child pornography on his phone in the instant case. (*see* DE 115:31; DE 27:7). The government further argued that the §404(b) evidence was necessary for its case because WhatsApp downloads were automatic, and thus, the downloads themselves were not evidence of intent that could be attributed to Blanc. (DE 115:22, 28). The government acknowledged that two phones had been seized from Blanc the day he was arrested in the 404(b) case, and that the phones had been forensically analyzed using Cellebrite. That inspection showed that WhatsApp was on both phones, but no child

pornography was found. (DE 115:19). The government also argued that the 404(b) case was inextricably intertwined with the instant case because the CBP had flagged Blanc for secondary inspection due to the 404(b) arrest. (DE 115:4).

Blanc opposed the evidence because it did not actually bear on the knowledge and intent element for which it was being offered, but instead, was only relevant through propensity reasoning. (DE 115:23-27). Blanc further argued that the 404(b) case did not bear on intent or knowledge because its facts established that he did not possess or collect child pornography on his phones. Blanc also argued that the prejudice caused by the evidence would overwhelm any probative value that the evidence had. (DE 115:34). For these reasons, Blanc requested that the evidence be precluded.

After a hearing, the court ruled in favor of admitting the 404(b) evidence. (DE 115:35). The court found that the §404(b) evidence was relevant to intent because it showed that Blanc had a sexual interest in young girls and threesomes which it deemed to be the same state of mind for the instant case. (DE 115:32-37). The court also indicated

that the evidence went to propensity, but it could still be admitted as long as there was another non-propensity purpose. (DE 115:20). The court also held that unfair prejudice did not outweigh the probative value. (DE 115:36). Alternatively, the court ruled that the evidence was inextricably intertwined with the current case due to the secondary inspection. (DE 115:37).

## II.    The §403 Motion *in Limine*

Blanc also filed a motion *in limine*, requesting that the child pornography videos not be played to the jury, but instead, that he be permitted to stipulate that the videos constituted child pornography, that they involved children under 12 years of age, and that had anyone, including himself, seen the videos, they would have had no question that they constituted child pornography. (DE 35:2). Blanc argued that permitting the videos when a stipulation was available violated Fed. R. Evid. 403. (DE 35:2). The government opposed Blanc's request. (DE 37:3-4). The court ultimately ruled in favor of the government and permitted it to play the child pornography video clips.

## III. The Second Trial

### A. Opening statements.

The government's opening statement at the second trial was telling. Rather than setting out the facts of what happened in the instant case, the government instead began by emphasizing the horrific nature of child pornography images generally. (DE 117:168). The government then switched over to the §404(b) evidence. After emphasizing these subjects, the government turned to the facts of the case at hand. It stated that law enforcement recovered a handful of videos of child pornography from Blanc's phone. (DE 117:169). It argued that Blanc knowingly and voluntarily possessed and transported those videos. (DE 117:169).

The defense argued that Blanc did not have the requisite knowledge or intent to possess the child pornography. (DE 117:170-72). It explained that the WhatsApp program was designed to automatically download images into WhatsApp photos and the camera roll of the phone every time WhatsApp came into contact with Wi-Fi. (DE 117:174-175). It noted that WhatsApp conducted such automatic

downloads even when it was only open in the background of the phone. (DE 117:174-175). The defense also argued that the 404(b) case did not establish intent because a forensic exam of his phones in that case established that Blanc did not possess child pornography on his phones. (DE 117:172).

The defense also summarized the findings of the government's forensic analysis of the phone in this case. The pattern of activity showed a massive stream of automatic downloads onto Blanc's phone, and within that massive stream were the child pornography videos at issue. (DE 117:177). The evidence further showed:

1.    Most of the data was from WhatsApp (DE 117:175);

2.    The government report analyzing the data on Blanc's phone was over 800,000 pages due to the massive amount of data on his phone (DE 117:175);

3.    Out of all the data, there was a total of 16[1] child pornography videos (14 originals and 2 duplicates). (DE 117:176);

_____

[1] The government originally informed the defense that there were 16 videos located on the phone, 14 original videos and 2 duplicates. Later

4. Only 3[2] of the WhatsApp groups out of the 72 that Blanc belonged to were responsible for the child pornography material. The majority of the material those groups downloaded had nothing to do with child pornography. (DE 117:176); and

5. The child pornography downloads occurred simultaneously with each other and simultaneously while the phone was performing other tasks and receiving other data, thus showing that they were automatic downloads that occurred while WhatsApp was operating in the background of Blanc's phone. (DE 117:177).

## B. The Government's Case in Chief

### 1. 404(b) Evidence – Detective Jeffrey Gosnell

As with its opening statement, the government led its evidentiary presentation with the §404(b) evidence. Over objection (DE 117:184), it

the government presented evidence that there was a total of 18 videos, 14 originals with 4 duplicates.

[2] The government originally informed the defense that there were 3 WhatsApp groups responsible for the videos at issue in this case. Later the government presented evidence that there was a total of 5 WhatsApp groups.

presented the testimony of Jeffrey Gosnell, the detective in charge of the §404(b) case. (DE 117:181). He operated an undercover Facebook profile that purported to belong to a 14-year-old girl. (DE 117:183). There was no conviction for this incident as it had not been resolved at the time of Blanc's instant trial.

According to Gosnell, Blanc contacted the Facebook page on the morning of April 26, 2021, and through texts back and forth, accepted an invitation to come to the girl's home for sexual activity. (DE 117:185-200). Blanc was arrested when he parked his car at a nearby park.

At the arrest, police seized two phones that Blanc had in his possession. Gosnell searched the phones with the aid of Cellebrite, but found no evidence of child pornography or searches for child pornography on either of Blanc's phones. (DE 117:210, 219).

### 2. Nathaniel Schorb, Customs & Border Patrol.

After the §404(b) evidence, the government turned to the facts of the instant case. It presented testimony from Nathaniel Schorb ("Schorb"), the CBP agent who met Blanc at the airport. (DE 117:221). Schorb explained that Blanc had been flagged for secondary inspection because of the prior arrest. (DE 117:224, 229).

Schorb began the secondary inspection at 12:03 pm. by obtaining Blanc's phone. (DE 117:239). He stated that he placed the phone on airplane mode so no new data would enter the phone. He obtained the password from Blanc who voluntarily gave it. (DE 117:233). Then Schorb conducted his search. He looked for child pornography, starting with deleted and hidden files. (DE 117:231-235). He did not find any child pornography videos in that file so he entered the WhatsApp program. (DE 117:235). In that program Schorb had to access the proper subfile, and after scrolling through that file, he found one child pornography video. (DE 117:237). At that point, Schorb called HSI to inform the agents of his discovery and to get permission to further search the phone. (DE 117:237).

As Schorb continued his search, three HSI officers arrived at the airport to assist. They included Special Case Agent Jeanne Neill ("Neill"), HSI forensic computer analyst Brian Hixson ("Hixson"), and Special Agent Stowers ("Stowers"). They conducted further searches of the phone and interrogated Blanc. (DE 117:239, 244).

Blanc was cooperative during the seven hours that he was interrogated by the agents. (DE 117:239). He provided passwords and access to whatever they needed. (DE 117:247). He answered their questions and he gave a recorded statement. (DE 117:246).

### 3. Brian Hixson, Homeland Security Investigations (HSI)

Brian Hixson, HSI computer forensics analyst testified next. (DE 118:10). He was an expert in the area of cell phone forensics. (DE 118:15). Hixson handled the technical aspects of extracting digital content from phones in a safe manner, and he provided the extraction and report to HSI case agents. (DE 118:10).

Hixson stated that he secured the phone at the airport and gave it back to the agents for their investigation. (DE 118:17). When the agents concluded their investigation, Hixson took charge of Blanc's

phone, and he took it back to the HSI lab for a thorough forensic analysis using the Cellebrite program. (DE 118:17-19). When he finished his analysis, Hixson generated an 800,000+-page report which analyzed each item of data on Blanc's phone, including deleted videos and search terms used by Blanc on his phone. (DE 118:23-37). Hixson noted that most of the data on Blanc's phone came from WhatsApp. (DE 118:32).

Hixson also testified as an expert regarding some of the limits of WhatsApp data and the Cellebrite analysis. Hixson explained that WhatsApp default settings automatically downloaded new data (videos and photos) onto members' phones when the WhatsApp program was open and it came into contact with Wi-Fi. (DE 118:34). He explained:

> Q: Okay. The standard WhatsApp settings are that if the app is open, it will automatically – I should    should say, when it hits Wi-Fi, save videos and photos to the WhatsApp folder and to the [sic] camera roll, as well, right?
> A: Correct.
> Q: And the phone in this case was set to default settings, right?
> A: I believe it was, yes.

(DE 118:34).

Hixson further stated that such automatic downloads would occur even if WhatsApp was open in the background of the phone. (DE 118:35). He explained that WhatsApp would continue to operate on the phone, even when the user was not looking at or interacting with WhatsApp. In order to turn WhatsApp off, the user had to go into settings and force it closed. Hixson explained:

> Q: Now, with the settings as it is on default, anytime that WhatsApp is opened and finds either an Internet or Wi-Fi connection, it will do an automatic download, right?
> A: Yes.
> Q: And that is true even if it's only open in the background, right?
> A: Correct.

(DE 118:34-35).

* * *

> Q: And for anybody who doesn't understand on the jury, can you explain what being opened in the background is?
> A: So if you open up an app on your phone and then just, you know – you swipe to go to another app, that other application is still running in the background unless you go through your settings on your phone to force-close those apps.

(DE 118:35).

Thus, as long as the app was open in the background of the phone, it would continue to successfully download data onto the phone and the

16

time of those automatic downloads into an open WhatsApp program would be recorded and marked as "read". Hixson's explained:

> Q: Now, as it relates to the Cellebrite extraction of WhatsApp, are you able to tell if a chat has been opened after it has been received?
>
> A. Yes.
>
> Q: And how?
>
> A: On the report, it will annotate that it was read or unread.
>
> Q: Okay. And can you tell how many times someone has read that message or chat?
>
> A: No, you can't.

(DE 118:21).

*       *       *

> Q: Agent, when a video is placed on a phone from WhatsApp, the Cellebrite extraction cannot tell you when a person opened and viewed that video, correct?
>
> A: Right.
>
> Q: It will only show you the download, when it was created, right?
>
> A: Yes. When it was placed on there, yes.

(DE 118:24).

Thus, Hixson made clear that although Cellebrite could record a timestamp for a successful download into an open WhatsApp program, it could not record a timestamp to verify that someone actually went into the WhatsApp and viewed or played the data.

Hixson also confirmed that the strength of the internet connection could affect timestamps of simultaneous automatic downloads. Hixson testified:

> Q: Would you agree with me that some Wi-Fi connections are faster than others?
> A: Yes.
> Q: And would you also agree that, for lack of a better term, some Wi-Fi connections are better than others?
> A: Yes.
>
> \*       \*       \*
>
> Q: Now, to download three videos at the exact same moment, typically, a phone might need a good Wi-Fi connection, right?
> A: Yes.
>
> \*       \*       \*
>
> Q: Now, if there's an insufficient Wi-Fi, downloads can be slow, right?
> A: Yes.
> Q: And they may come in one at a time rather than all at once?
> A: They could, or they could come at once. It's still simultaneously trying to download.

(DE 118:35-37).

Hixson also confirmed that Blanc's WhatsApp program was on the default settings. (DE 118:34). And he agreed that Cellebrite's recorded pattern of incoming data established that WhatsApp did automatically download child pornography onto Blanc's phone. (DE 118:34-34-38).

This was evident because multiple downloads occurred simultaneously with each other and with other activities on the phone. (DE 118:34-38).

### 4. Case Agent Jeanne Neill, Homeland Security

Case agent Neill also testified. She stated that she went to the airport after she was contacted by Schorb. (DE 118:43). She saw a cluster of child pornography videos that had been downloaded onto Blanc's phone on January 2, 2022. (DE 118:45). After reviewing these materials, Neill interviewed Blanc with CBP agent Schorb and HSI agent Stowers. (DE 118:46). The interrogation was approximately 1½ hours long, and there was a break in the middle.

### a. Blanc's Interrogation

During Neill's testimony, the government played the audio recording of Blanc's interrogation. (DE 118:45-50, Exh. 8A-8C). In the recording, it was clear at times that Blanc was confused. (See e.g., DE 118:120-121). It was also clear that Blanc was cooperative, he signed a *Miranda* waiver and a consent to search his phone, and he provided all passwords, user names, and information that he was asked to provide. (DE 118:59-61).

Blanc acknowledged he belonged to many WhatsApp groups. He stated that he occasionally made general Google searches for adult pornography, but he did not search for child pornography. (DE 76-9:21-22). Blanc further stated that he removed himself in November 2021 from a group that sent an inappropriate child video by making critical comments of the content, which led the administrator to drop him. (DE 76-9:28; 76-10:3). He noted that inactive WhatsApp threads remained on his phone even after he no longer belonged to those groups. (DE 76-9:22-23, 31; *see also* DE 118:56). He also noted that he was unable to keep up with his groups and he did not check them regularly, so he was not aware of subsequent automatic child pornography downloads that entered his phone. (DE 76-9:28; 76-10:4).

Blanc showed Neill several groups that he was removed from. (DE 76-10:3-7). Neill agreed that she saw removal messages in certain groups, including one which had removed Blanc in November 24, 2021. (DE 118:119). Neill disputed that this evidenced Blanc removing himself. (DE 76-10:1, 8; *see also* DE 118:54-58). Blanc repeated that he made critical remarks about the content when he saw it, and that led

the administrator to drop him. (DE 76-10:3, 8). Blanc maintained that the removal messages evidenced his exit from the offending groups. (DE 76-10:3-8). Blanc also stated that he was not aware of other subsequent inappropriate child videos that had been downloaded by WhatsApp. (DE 76-10:8).

Neill told Blanc that there was a problem because he saw certain images, but he did not delete those images or the offending thread from his phone. (DE 76-10:10-11). She also indicated that it "looked bad" because he had the pending prior 404(b) arrest. (DE 76-10:11). Neill then had Blanc arrested. (DE 76-10:15-18).

### b. Neill's Lay Opinion Testimony.

After the interrogation, Neill presented her lay opinion testimony regarding Blanc's interrogation and the Cellebrite/WhatsApp data. Neill was not an expert in either Cellebrite or WhatsApp. (DE 118:40). However, she stated that she was familiar with both programs through her work, and she had also used WhatsApp for approximately five years in some of her personal communications. (DE 118:55).

Neill agreed that WhatsApp had automatic downloading features that were pre-set in the default mode of the program. (DE 118:66). And further, that the pattern of downloads on Blanc's phone evidenced automatic downloading. (DE 118:66, 116-117). These patterns included simultaneous downloads, and downloads that were simultaneous to other multiple actions on the phone. (DE 118:116-117). Neill testified that such simultaneous downloading and multiple actions indicated that the WhatsApp program was open in the background of the phone. She also agreed that a person could not read or view simultaneous downloads. (DE 118:117).

Neill continued to dispute Blanc's statements that he had exited a group for posting inappropriate child videos. She maintained that a person exiting a group got a message that said, "you left," while people who were removed from groups received a different type of "removal" message. (DE 118:56-57). She also disregarded Blanc's statements that he had criticized groups back in November 2021 so he would be removed, and that he failed to keep up with his more current messages, and thus, was unaware of subsequent child videos.

However, Neill acknowledged that Blanc was confused during part of her interrogation  She acknowledged such confusion with respect to her questions involving the January 2022 videos she had found.  She noted that she was asking about January 2022 videos, but it was clear that Blanc was not following her questions, but was instead discussing the November 2021 timeframe when he removed himself from a group. (DE 118:120-121).  Neill conceded she never cleared up this confusion and she did not try to verify Blanc's statements even though she had seen WhatsApp removal messages, including from the November 2021 timeframe.  (DE 118:119-121). Instead, she gave her opinion that he failed to remove himself from the groups based on a *pro forma* search within the Cellebrite report for the words "you left," which she said yielded negative results.  (DE 118:70-72, 106).

In addition, Neill gave her own analysis of the Cellebrite report. First, she gave summary testimony accompanied by a summary chart of the Cellebrite report.  (DE 118:69-70; Exh. 15).  She stated that there were five WhatsApp groups that had downloaded child pornography onto Blanc's telephone.  These groups were:  **(1)** "Men neg aboul yo"; **(2)**

"Rache pwel timoun 2000"; **(3)** "Vibes groups xxx #13"; **(4)** Antistress; and **(5)** Sexe. Her summary chart purportedly indicated the date Blanc joined the groups, the dates that child pornography was downloaded from the groups, and the number of child pornography videos that were downloaded. (DE 118:69-70; Govt Exh. 15). Neill testified that between November 20, 2021–January 2, 2022, there were five WhatsApp groups that downloaded a total of 18 child pornography videos. *Id.* The government then played video clips of some of those child pornography videos over the objection of the defense. (DE 118:72).

Neill gave lay testimony about each group based on small excerpts from the Cellebrite report. (DE 118:75-93; Govt Exhs. 42-46). Her lay opinions proved to have many discrepancies, making them misleading and unreliable. To start, Neill could not explain why a Wi-Fi connection to Blanc's phone dated February 8, 2022, was documented on the Cellebrite report. (DE 118:95-96; Exhs. 42-46). Neill could not explain what had occurred with this Wi-Fi connection or if it had altered the data on Blanc's phone. *See id.* Additionally, Neill could not explain how the Wi-Fi connection could be present given that she and other agents

had testified that the phone had been secured at Blanc's arrest on January 19, 2022. *Id.*

In addition, Neill had difficulty explaining the basis for many of her lay opinions because during her testimony, she referenced certain terms that were listed on the Cellebrite report, but she could not fully explain what those terms meant. For example, Neill testified that each of the five offending WhatsApp groups had an "active status" through 1/19/22, according to the Cellebrite report. *Id.* However, when asked, Neill could not say whether Cellebrite's "active status" notation distinguished between archived groups that Blanc had been removed from but were still on his phone, versus groups that were still open and actively receiving data. (DE 118:106).

Additionally, Neill referenced Cellebrite's "read status" notation to give the jury the impression that messages and images had been viewed or read. (See DE 118:77, 81, 85, 88, 90, 92-93, 97-98, 129). But she later admitted that the "read" status notation did not mean that the messages or images had actually been viewed or read. (DE 118:97). Rather, she admitted that the "read" status notation only indicated that

the WhatsApp group was open. (DE 118:97-98). She further acknowledged that many of the child pornography videos were downloaded simultaneously, and that a person could not read simultaneous downloads. (DE 118:97).

Additionally, several notations on the Cellebrite report indicated that information had been deleted. (DE 118:98-101). Neill was unable to explain what the deleted notations were. In fact, Neill indicated that the Cellebrite report could have included deleted items and modifications that were done, not only by Blanc, but by other WhatsApp members, and including time periods that the group existed, even before Blanc joined it. (DE 118:98-101). Furthermore, Neill, admitted that she had never conducted research to gain a more full understanding of the Cellebrite/WhatsApp data that she was testifying about. (DE 118:98-101; Gov't Exhs 42-46).

Neill also could not explain why the information on her summary chart (Govt Exh. 15) varied on the number and dates of certain downloads. (DE 118:123-129). For example, the Cellebrite report showed that WhatsApp purportedly downloaded a child pornography

video onto Blanc's phone on November 22, 2021. (DE 118:125, 130-131). However, Neill's Summary Chart mentioned no corresponding download on that date. (Exhibit 15). Additionally, chart 15 showed a discrepancy in the number of videos that were downloaded on 12/28/21. (DE 118:125). Neill could not explain the discrepancies. (DE 118:125, 131).

Neill also conceded that she had erred in her original report regarding the number of offending videos and WhatsApp groups. (DE 118:65-66; 99-100). According to Neill her updated numbers were higher than what she had originally reported and testified under oath at the first trial. *Id.*

Thus, Neill expressed confusion and a lack of knowledge about significant portions of the Cellebrite and WhatsApp information that she testified about. Nonetheless, Neill testified as follows:

1. Blanc joined the "Men neg aboul yo" group on 11/20/21, and that group remained "active" until 1/19/22. (DE 118:76; Exhibit 42). Within the message thread, there was a child pornography video that had been marked as "read" and a provocative picture of an adult woman. (DE

118:76-79). Neill says Blanc commented on the photo of the adult woman. (DE 118:79).

2. Blanc joined the Rache pwel timoun 2000 group on December 16, 2021, and that group remained "active" until 1/19/22. (DE 118:80). When he joined, he posted a picture of himself, and he made a short introduction. (DE 118:81). This group showed that two child pornography videos were posted on December 28, 2021, and Cellebrite marked their status as "read". (DE 118:81). A subsequent postdated 1/16/22 showed that Blanc messaged an adult female who was a member of the group. (DE 118:82).

3. The Vibes group was marked "active" until 1/19/22. A child pornography video had been posted December 27, 2021, and Cellebrite had marked the post as "read." (DE 118:84-85).

4. Blanc originally created the Antistress group on 9/2/2018, and he rejoined the group on 12/27/21. (DE 118:86-87). The Cellebrite report showed the group as "active" until 1/19/22. (DE 118:86). The report also showed that four child pornography videos were downloaded

to this group on 12/29/21, and that Cellebrite marked their status as "read". (DE 118:88).

5.  Blanc joined the Sexe group on 1/2/2022, and Cellebrite marked the group as "active" until 1/19/22. (DE 118:90; Exh. 46). There were nine child pornography videos downloaded onto this group that Cellebrite marked as "read." (DE 118:90-93).

Ultimately, Neill agreed overall, that the amount of child pornography on Blanc's phone was miniscule and buried in a massive stream of data that had been automatically downloaded onto the phone in a compressed period of time. (DE 118:101-109). She agreed that 67 out of the 72 WhatsApp groups had 0 child pornography videos. (DE 118:108-109). And for the 5 offending groups, the child pornography videos were only a miniscule fraction of what those groups sent: for the "Men neg" group only 2 downloads were child pornography out of 1696 downloads total; for the "Rachell pwel timoun 2000" group only 2 downloads were child pornography out of 2438 downloads total; for the "Vibes" group only 1 download was child pornography out of 594 downloads total; for the "Antistress" group only 4 downloads were child

pornography out of 352 downloads total; and for the "Sexe" group only 9 downloads were child pornography out of 160 downloads total. (DE 118:101- 104). Neill also agreed that Cellebrite detected 0 searches by Blanc for child pornography. (DE 118:112-113).

The government also called a Creole/French interpreter who translated certain Creole and French words that were in the WhatsApp chats.

## C.    The Defense

### 1.    Motions

After the government concluded its case, the defense renewed all of its previous pretrial and trial motions, including those from the first trial. (DE 118:148). It also made a Motion for Judgment of Acquittal. It argued that there was insufficient evidence of knowledge that Blanc voluntarily possessed or transported child pornography. (DE 118:148). The evidence taken in the light most favorable to the government established that Blanc had WhatsApp default settings, and that the videos were automatically downloaded. (DE 118:148-149). There was no evidence that he was aware of or had voluntarily viewed the child

pornography videos, except for one or two initial videos which had led him to seek removal from those groups. Further, the evidence showed that Blanc had never searched for child pornography, he had never commented on the child pornography, and only a small fraction $\frac{18}{5234}$ or .3% of the voluminous materials on his phone constituted child pornography. (DE 118:149-152).

The defense also argued that the 404(b) evidence could not establish intent because it was improper propensity evidence, the intent elements between the two cases were different, and Blanc did not possess child pornography in the 404(b) case in any event, making the probative value of that case very low. (DE 118:149-150).

The court denied the defense motion for judgment of acquittal. It explicitly relied on the 404(b) evidence as the reason that it denied the motion, stating that the 404(b) evidence provided the necessary evidence for the knowledge and intent.

## 2. The Defense Exhibits.

Blanc declined to testify (DE 118:155). However, the defense presented exhibits on Blanc's behalf which set out additional parts of

the Cellebrite report. (Defd Exhs A[3] and B). These Cellebrite excerpts established that multiple activities were being performed on Blanc's phone simultaneously, thus confirming the automatic nature of the massive downloads onto his phone through WhatsApp. (*See* DE 118:116). The defense renewed its pretrial and trial motions, and the court denied those renewed motions. (DE 118:158).

## D.  Closing Arguments and the Verdict.

During the closing arguments, the government went through a summary of its evidence. It re-emphasized the 404(b) evidence. (DE 119:38-41). And the defense objected based on propensity. (DE 119:40).

In closing rebuttal, the government made a new argument concerning the technical nomenclature on the Cellebrite report. The government argued that a "Created / Modified / Accessed" notation on the Cellebrite report found in Defendant's Exhibit B, video number 14, was evidence that Blanc viewed video number 14. (DE 119:77). The defense objected, citing to the fact that there was no evidence to support such an argument, and that the government's expert witness,

---

[3] Exhibit A was entered into evidence out of turn during Agent Neill's cross-examination.

contradicted such arguments. (DE 119:76). The court overruled the objection, instructing the jury that it would have to rely on its own recollection as to the evidence. *Id.* The government then doubled down on the argument, reiterating it at length. (DE 119:77). After the jury was excused, the defense made a motion for a mistrial based on this argument which the court denied. (DE 119:80-84).

In its closing, the defense argued that the government had abused the 404(b) evidence and it had become an improper feature of the case. (DE 119:144). It further noted that the 404(b) case did not prove what the government wanted in any event, because no child pornography had been found on Blanc's two phones in the 404(b) case. The defense also highlighted the many discrepancies of Neill's testimony. The defense also reiterated that the government's own data established a massive stream of automatic downloads onto Blanc's phone within a compressed period of time. And that out of that massive stream less than one percent contained child pornography. Given the automatic downloads and the volume of material, intent had not been proven.

After deliberations, the jury found Blanc guilty of both charges in the indictment. (DE 119:87).

## IV.        Presentence Investigation Report (PSR) and the Sentencing.

### A.    The Presentence Investigation Report.

After trial the United States Probation Office (USPO) prepared a Presentence Investigation Report (PSR).  The PSR calculated the guidelines under U.S.S.G. §2G2.2.  Under that guideline, Blanc's base offense level was 22.  In addition, the PSR added the following enhancements:  (1) two points for an image of a prepubescent child under the age of 12 (2) four points for sadistic/masochistic/toddler infant images; (3) two points for the use of a computer; (4) four points because Blanc was held responsible for 301 child pornography images.  (PSR ¶¶ 25-29).  Thus the PSR recommended a total level of 34.  Blanc had a criminal history category (CHC) of I.  With a level of 34, CHC I, Blanc's sentencing guideline range was 151-188 months imprisonment.  (PSR ¶ 79).

Blanc objected to the factual assertions in the PSI.  (DE 80, 83). He also objected to the two-point computer enhancement,  the four-

point image enhancement, and the substantive reasonableness of the sentence. *Id.*

### B. The Sentencing

Sentencing was held December 1, 2022. (DE 84). The court overruled the defendants objections to the guideline range and it ruled that Blanc was responsible for 600 child pornography images. This increased the offense level by one point, making the total offense level 35, CHC I, for a guideline range of 168-210 months. (DE 94:11-12).

The defense argued for a downward variance. It cited national statistics that showed that 80% of the defendants across the nation who were similarly situated to Blanc, received a sentence of 104 months. (DE 94:6-7, 23).

The court denied the defendant's request. In considering the §3553(a) factors, the court relied heavily on the §404(b) evidence. The court stated that the pending 404(b) case took it out of the average case and made the case more egregious. Thus, the national statistics were not applicable. The court then sentenced Blanc to the low end of the calculated guideline range which was 168 months.

The defense reiterated its objections to the amount of images and to the reasonableness of the sentence. (DE 94:32). It also objected to the use of the 404b case as uncharged, unproven conduct which violated Blanc's presumption of innocence in that case. (DE 94:33).

A timely notice of appeal was filed December 13, 2022. (DE 88). This appeal follows.

## Standards of Review

While review of a district court's evidentiary rulings is generally for abuse of discretion, *see United States v. Todd*, 108 F.3d 1329, 1331 (11th Cir. 1997), its interpretation of rules relating to the admission of evidence and constitutional factors arising out of evidentiary rulings is subject to plenary review. *See United States v. Bagley*, 537 F.2d 162, 165-66 (5th Cir. 1976). The cumulative effect of multiple errors can deprive the defendant of a fair trial, requiring reversal. *United States v. Labarbera*, 581 F.2d 107, 110 (5 th Cir. 1978).

Sufficiency of the evidence is a question of law subject to *de novo* review. *United States v. Hernandez*, 141 F.3d 1042, 1049 (11 Cir. 1998). Viewing the evidence in a light most favorable to the government, the court must determine whether "there is substantial evidence to support the verdicts." *United States v. Russo*, 796 F.2d 1443, 1455 (11 Cir. 1986).

This Court reviews *de novo* the district court's interpretation of the guidelines and its application of the guidelines to the facts. *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2011) (*citing*

*United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007)). The reasonableness of a sentence is reviewed for an "abuse of discretion." *Gall v. United States*, 552 U.S. 38, 51 (2007).

## Summary of the Argument

Blanc was convicted of knowingly possessing and transporting child pornography on his cell phone. He asserts that he did not have a knowing intent to possess such illicit material. He further asserts that the evidence overwhelmingly showed that the images on his phone were buried on his phone in a massive stream of data that had been automatically downloaded from the WhatsApp social medica platform that he used. The volume of data and the patterns of simultaneous downloads to his phone showed that it would have been physically impossible for him to intentionally gather such information, and further that out of several thousands of downloads that came through this stream of information, only 18 videos or .3% of the information constituted child pornography. He did not want such images and he did not knowingly possess or transport them.

Blanc asserts that the government improperly and unfairly used a prior arrest that he had as a way to get around its evidentiary burden. The arrest was admitted under Fed. R. Evid. 404(b). He asserts that the evidence was improperly admitted in violation of Rule 404(b) under the guise of proving intent. However, although the 404(b) arrest involved a minor, it did not share the same intent element as was required in this case, and its probative value was substantially outweighed by its prejudicial effect. It was improper propensity evidence.

Blanc asserts that other evidence was erroneously presented at trial. First, video clips of the child pornography in this case were played for the jury. The probative value of those clips, however, was low because he proffered stipulations that would have obviated the need to play the video clips. Thus, playing actual child pornography video footage was unnecessary and highly inflammatory.

The court also erred in permitting the case agent to offer improper lay opinion testimony. The testimony was improper under Fed. R. Evid. 701 because the witness opined on subjects that were not within her

rational perception or personal knowledge; she gave uninformed and misleading testimony that was not helpful to the jury; and she tread into technical matters and nomenclature in which she had no basis or expertise.

The court also permitted improper closing rebuttal arguments by the government which were not supported by the evidence, and which misled the jury regarding technical nomenclature used by WhatsApp and Cellebrite to draw unfair and prejudicial inferences against Blanc. These errors independently and cumulatively require reversal.

Blanc also contests his sentence. He argues that the court improperly held him responsible for 600 or more images which resulted in a 5-point enhancement. This was improper under intervening authority *United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023). Finally, Blanc also contests his sentence as being procedurally and substantively unreasonable.

# ARGUMENT AND CITATIONS OF AUTHORITY

## I. The Court Reversibly Erred When It Permitted Improper §404(b) Evidence.

Mr. Blanc challenges the admission and use of his prior arrest as evidence under Fed. R. Evid. 404(b). Rule 404 (b) states:

> **(b) Other Crimes, Wrongs, or Acts.**
>
> **(1) Prohibited Uses.** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Rule 404 was originally adopted to protect defendants from unfair character evidence because it was recognized that such evidence had a low probative value and a high risk of unfair prejudice. Fed. R. Evid. 404(a) Advisory Committee's Note to 1972 proposed rules; *see also Michelson v. United States*, 335 U.S. 469, 475-76 (1948).

Accordingly, disallowance of such evidence was provided in Rule 404(b)(1), and under Fed.R.Evid. 403, to prevent confusion of the issues, unfair surprise and undue prejudice. *Michelson*, 335 U.S. at 475-76; *see*

*also United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014) ("Rule [404(b)] reflects the revered and longstanding policy that, under our system of justice, an accused is tried for what he did, not who he is.").

This Court has developed a three-part test governing the admissibility of such extrinsic evidence: "(1) the evidence must be relevant to an issue other than the defendant's character; (2) sufficient evidence must be presented to allow a jury to find that the defendant committed the extrinsic act; and (3) the probative value of the evidence must not be substantially outweighed by its undue prejudice," in conformance with Fed. R. Evid. 403. *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992), *citing United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978).

### A. The Government Violated the First and Third Prongs of the Three-Part Test Governing Admissibility of Extrinsic Evidence Pursuant to Fed. R. Evid. 404(b).

The first prong of this Court's three-part rule was violated because the government used Blanc's prior arrest as propensity evidence. Although the government proffered a non-propensity rationale of knowledge and intent, its reasoning was defective because the intent

element in the 404(b) case was not the same as the intent element in the instant case. On that basis alone, the government's 404(b) evidence failed. *See United States v. Cardenas*, 895 F.2d 1338, 1343 (11th Cir. 1990) (noting that relevance under 404(b)'s first prong where testimony is offered as proof of intent requires that the extrinsic offense have the same intent as the charged offense).

The 404(b) case and the instant case involved fundamentally different types of crimes with different types of intent. The more serious of the two was the extrinsic §404(b) case, where Blanc was alleged to have interacted with an undercover officer in a sting operation, while the instant charges involved the possession of child pornography on his cell phone. Any generalized argument that the crimes involved minors was overbroad, and amounted to nothing more than a very general propensity argument. Furthermore, such generalizations glossed over important factual distinctions, namely that the 404(b) case proved through a forensic examination of Blanc's phones that Blanc did not possess child pornography. Because the circumstances of the 404(b) case specifically contradicted an intent to

possess pornography, the 404(b) case was not relevant to the intent element in Blanc's instant case. Its only relevance was generalized propensity which is prohibited by Rule 404(b).

In addition, the use of the 404(b) arrest was unfairly and unduly prejudicial in violation of prong three of this Court's 404(b) requirements. This Court has held that the undue prejudice prong for purposes of Rule 404(b) is linked to Fed. R. Evid. 403. Rule 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Unfair prejudice is when the jury has been led to make its decision on an improper, irrational, or emotional basis. Fed. R. Evid. 404(a) Advisory Committee's Note; *Michelson*, 335 U.S. at 475-76. That is exactly what happened in Blanc's case.

First, the type of 404(b) evidence in Blanc's case carries a serious risk of undue prejudice. *See Beechum*, 582 F.2d at 914. Not only does it implicate criminal activity, but it also implicates crimes that are

extremely heinous and inflammatory. Furthermore, the 404(b) case was more serious than the present possession charges, and thus it risked overshadowing the facts in the instant case.

The government exacerbated this risk of undue prejudice by dedicating a large portion of its arguments and evidence to the 404(b) case including the beginning of its opening statement, its very first witness, and its closing argument. Through this constant emphasis on the 404(b) case, undue prejudice was very high.

Furthermore, the probative value of the 404(b) evidence was very low. As explained above, the two cases did not share the same intent, and the 404(b) incident cut against the idea that Blanc possessed or collected child pornography on his phones. This made the 404(b) case a suboptimal vehicle for proving anything in Blanc's instant possession case. Due to these unique circumstances, the probative value of the 404(b) case was lower than most government 404(b) proffers.

Accordingly, the court erred by admitting the 404(b) evidence because its probative value was substantially outweighed by undue prejudice. *Cf., United States v. Hands*, 184 F.3d 1322, 1328 (11th Cir.

1999) (extrinsic evidence of domestic violence is inflammatory and likely to incite jury to irrational decision, and thus, should have been excluded under Fed. R. Evid. 403); *United States v. Utter*, 97 F.3d 509, 514 (11th Cir. 1996); *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997) (extrinsic evidence of murder was improper and extremely inflammatory).

The court's admission of the 404(b) evidence in Blanc's case failed to uphold meaningful standards of relevance and meaningful safeguards against undue prejudice. The task should not merely be " 'to find a pigeonhole in which the proof might fit,' but to actually demonstrate that the evidence 'prove[s] something other than propensity.'" *Caldwell*, 760 F.3d at 267, *citing* Mueller, *Federal Evidence* § 4:28 at 731. Under *Caldwell*, the government and the district court are required to "explain how [the evidence] fits into a chain of inferences – a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference." *Id*. Thus, if the chain of inferences includes a link of propensity, the evidence must be excluded. *Id*.

The district court in Blanc's case followed the opposite approach. It indicated that propensity evidence was acceptable as long as some other non-propensity reason could be proffered. (DE 115:20). Thus once the district court concluded that intent was at issue, it threw open the doors allowing any evidence offered under the intent banner. However, this was in error as demonstrated above because the intent elements between the two crimes were different, and because the 404(b) evidence actually established that Blanc did not possess child pornography on his phones in the 404(b) case. Accordingly, Blanc's convictions should be reversed.

B.     **The Evidence Was Not Admissible Under the Inextricably Intertwined Doctrine.**

The court also erroneously ruled that the 404(b) case was admissible through the inextricably intertwined doctrine. A prior act is only inextricably intertwined with the *res gestae* of a crime when removing the prior act would cause the remaining evidence to be incomplete and confusing. *United States v. Chilcote*, 724 F.2d 1498, 1501 (11th Cir. 1984). In Blanc's case, the instant crime would have

been completely comprehensible without the testimony concerning the prior 404(b) arrest. The only link was that law enforcement flagged Blanc for secondary inspection due to the prior arrest. However, the 404(b) case and the instant case were completely separate matters. The facts of the two cases did not overlap and they were not interlinked. The jury could certainly understand the facts of the instant case without being privy to law enforcement's internal policies concerning secondary inspections. Accordingly the prior arrest was not inextricably intertwined evidence.

II. **The Court Reversibly Erred Under Rule 403 When It Admitted Unduly Prejudicial Child Pornography Video Clips Into Evidence In Lieu of the Defendant's Stipulations.**

The court also violated Rule 403 when it permitted clips of video footage of child pornography to be played to the jury even though the defense had proposed to stipulate that the videos on Blanc's phone: (1) were child pornography, (2) included images of children under the age of 12, and (3) were so clearly child pornography that anyone who saw the images, including Blanc, would have immediately known that they were child pornography. Through these stipulations, Blanc's

admissions would have been conclusive evidence on multiple elements in the case.  Accordingly, the presentation of the video clips had a low probative value to the issues in the case, but they possessed an extra-inflammatory punch which carried a high risk of unfair prejudice against Blanc.

As acknowledged by the defense, Blanc's instant charges involved subject matter that was extremely inflammatory and which people would "not be human" if they did not have a strong emotional response to it. (DE 117:170).  In fact, such evidence was so intrinsically inflammatory that courts have recognized the need for post-trial counseling services for jurors who cannot manage the emotions associated with viewing such videos and pictures. *See* University of Mississippi, *Judicial Guide:  A Judge's Guide to Exposure to Child Pornography     for     Court     Personnel     and     Jurors*, <https://olemiss.edu/depts/ncjrl/pdf/I%20C%20A%20C/2013 %20-%20April%2018-19/06d%20-%20Judicial%20Guide.pdf>  (accessed July 22, 2023).  The type of videos in this case are clearly unique in their prejudicial impact, and they even outstrip revelations of a

defendant's criminal history, which until this point, has been the icon of prejudicial evidence, thus prompting the Supreme Court in *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997), to impose limits when stipulations are available, for the purpose of preserving due process and Sixth Amendment rights to fair trials.

The district court did not properly analyze the probative value versus the risk of undue prejudice when it admitted the video clips. Rather, it summarily relied on the government's general right to prove its case with the evidence it preferred. However, under *Old Chief*, it is clear that Rule 403 requires more:

> On objection, the court would decide whether a particular item of evidence raised a danger of unfair prejudice. If it did, the judge would go on to evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well. If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfair prejudicial risk.

*Old Chief*, 519 U.S. at 182-83. This assessment requires that the courts follow the mandate of Rule 403 against usurpation of trial proceedings through unfair prejudice by preventing the government from

"structur[ing] a trial in whatever way would produce the maximum unfair prejudice consistent with relevance." *Old Chief*, 519 U.S. at 183. Using Rule 403's balancing test which requires a weighing of the probative value versus the unfair prejudice, other courts have found that rejecting stipulations to admit such highly inflammatory images violates Rule 403. *See United States v. Merino-Balderrama*, 146 F.3d 758, 761-763 (9th Cir. 1998) (the defense stipulation offer was conclusive on the elements in question and the introduction of the pornographic images was unfairly prejudicial and not harmless error). In light of Blanc's offer to stipulate, the court erred under Rule 403 when it permitted video clips of child pornography to be played at the trial.

## III. The Court Reversibly Erred When It Permitted Improper and Unreliable Lay Opinion Testimony.

The court also erred in permitting lay opinion testimony by agent Neill that violated Fed. R. Evid. 701. Under Rule 701, lay witnesses are limited to giving opinions or making inferences which (1) are rationally based upon the witness's perception; (2) are helpful to the jury's understanding of the evidence; and (3) are "not based on scientific, technical or other specialized knowledge within the scope of Rule 702."

Fed. R. Evid. 701.  The proponent of the lay witness's testimony bears the burden of providing an adequate foundation for the lay testimony.

A lay witness cannot be used to make "a jury argument from the witness stand." *United States v. Cano*, 289 F.3d 1354, 1363 (11th Cir. 2002).  Thus, Rule 701 is designed to exclude lay opinion testimony that "amounts to little more than choosing up sides, or that merely tells the jury what result to reach." *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016).

In this case, Neill explicitly testified as a lay witness concerning WhatsApp and Cellebrite.  (DE 454:134).  She did not have the technical expertise to testify as an expert.  (DE 454:134).  Indeed, as was clear from her cross examination, there were whole swaths of information concerning WhatsApp and Cellebrite that Neill did not understand.  Nonetheless, Neill gave opinions and made inferences that overreached her scope as a lay witness and the bounds of Rule 701. Most critically, Neill structured her testimony to give lay opinions and inferences on the key issue of Blanc's knowledge and intent.  She purported to interpret the WhatsApp and Celerate data for the jury, but

she gave misleading and unreliable information about terminology that these technologies used, and she often speculated about information to which she did not have person knowledge. Neill was unable to explain why a Wi-Fi connection to Blanc's phone dated February 8, 2022, was documented on the Cellebrite report; she testified about terms and notations that she could not fully explain; she also could not explain why her summary report did not match up to the underlying Cellebrite report; and she gave misleading testimony about WhatsApp's "read" notation to lead the jury to infer that Blanc had actually read messages or viewed videos when she knew that the "read" status meant no such thing. Thus, Neill's testimony broke all the rules of lay opinion testimony: she opined on subjects that were not within her rational perception or personal knowledge; she gave uninformed and misleading testimony that was not helpful to the jury; and she tread into technical matters and nomenclature in which she had no basis or expertise. Neill essentially gave a jury argument from the witness stand. She invaded the province of the jury in violation of Fed. R. Evid. 701 and the Fifth

and Sixth Amendment rights to due process and a fair jury trial. Accordingly, Blanc's convictions should be reversed.

## IV. The Court Reversibly Erred When It Permitted Improper Closing Argument and When it Failed to Grant a Mistrial.

The court also erred by permitting improper and prejudicial argument during the government's closing rebuttal argument, and by denying the defense motion for a mistrial due to that improper argument. The government gave improper argument regarding a "Created / Modified / Accessed" notation on the Cellebrite report which was unsupported by the evidence and contradicted the government's expert. (DE 119:77).

"A prosecutor's statement will justify a reversal if it undermined the fairness of the trial and contributed to a miscarriage of justice." *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir. 1990). During closing arguments, a lawyer may not make "[i]mproper suggestions, insinuations, [or] assertions calculated to mislead or inflame the jury's passions. . . ." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009), cert denied, 131 S. Ct. 413 (2010). Improper statements by a

prosecutor will result in reversal when: "(1) the challenged remarks misled the jury and prejudiced the accused; (2) the statements were extensive; (3) the statements were purposely placed before the jury; and (4) the strength of the independent evidence of guilt is not overwhelming. *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994); *see also, United States v. Eckhardt*, 466 F.3d 938 (11th Cir. 2006).

The government's offending closing rebuttal arguments– like the improper lay testimony presented through Neill discussed above – confused and misled the jury about the technical nomenclature that was used through the WhatsApp and Cellebrite reports. The main purpose of this argument was to prove the knowing intent element, even though the evidence did not support that argument. Additionally, the government's statements were extensive and made in the closing rebuttal argument so that the defense had no opportunity to respond. Further, the independent evidence of guilt was not overwhelming. The government admitted as much throughout the proceedings, and the first trial ended in a hung jury. The court reversibly erred when it failed to

strike the argument or grant the subsequent motion for mistrial. This Court should reverse.

## V. Cumulative Error Requires Reversal.

Blanc submits that the errors discussed above, whether singly or cumulatively warrant reversal of his case. The cumulative error doctrine provides that an aggregation of non-reversible errors can yield a denial of the constitutional right to a fair trial which calls for reversal. *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987). The cumulative prejudicial effect of many errors may be greater than the prejudice caused by each individual error. *United States v. Baker*, 432 F.3d 1189, 1223-24 (11th Cir. 2005). Moreover, such errors may warrant reversal even if the evidence, had no error occurred, would have been sufficient to support the conviction. *Baker*, 432 F.3d at 1224. As noted above, the court made many grave errors. These errors viewed independently or in combination substantially prejudiced Blanc during his trial, and his convictions should be reversed.

## VI. The Evidence Adduced at Trial Was Insufficient to Prove Beyond a Reasonable Doubt that Blanc Was Guilty of the Charges in the Indictment.

In this case, the evidence was not sufficient to show that Blanc knowingly transported or knowingly possessed child pornography in violation of 18 U.S.C. §2252(a)(1) or §2252(a)(4)(B). The sole issue at trial was whether Blanc had the requisite knowing *mens rea*. The government had the burden to show beyond a reasonable doubt that Blanc's transportation and possession was done voluntarily and intentionally and not because of mistake or by accident. Eleventh Circuit Criminal Pattern Jury Instruction No. B9.1A.

In the instant case, the government failed to present evidence that Blanc had the requisite knowing intent. The government acknowledged that the existence of the child pornography on Blanc's phone along with the voluminous general automatic downloads employed by WhatsApp was not enough to prove the intent element.

The government, therefore, attempted through other means to fill in the evidentiary gap. However, it relied on improper §404(b) evidence, improper lay testimony, and improper argument to fill-in the void.

However, as explained above, such evidence could not fill the evidentiary void because those means for proving knowledge and intent were improper and should have been excluded. Even allowing for such evidence, sufficiency was still lacking. A close analysis of the 404(b) evidence shows that the evidence cuts against a knowing intent since the circumstances of the 404(b) case established that Blanc did not possess or collect child pornography on his phone. Similarly, Neill's improper lay testimony failed to establish a knowing intent because the opinion and inferences she attempted to draw were not sound, and they contradicted the evidence that the government had put in through its expert and other witnesses. Moreover, the arguments made by the government in its closing rebuttal were also erroneous speculation and were not evidence in any event. Taking the evidence in the light most favorable to the government, there was not sufficient evidence of knowledge to sustain a conviction against Blanc. Accordingly, Blanc's convictions should be reversed and dismissed.

## VII.  Blanc's Sentence Should Be Reversed.

Mr. Blanc's sentence was also imposed in error because it was based on improper guideline calculations, and it did not adequately take into consideration the sentencing factors under 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 n.6 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Booker*, 543 U.S. 220.

### A.  The Number of Images Attributed to Blanc Under U.S.S.G. §2G2.2 Violated United States v. Dupree, 57 F.4th 1269 (11th   Cir. 2023) and Kisor v. Wilkie, 139 S.Ct. 2400 (2019).

The defense had objected to the number of images attributed to Blanc by the PSR and by the court under U.S.S.G. §2G2.2.  The court held Blanc responsible for 600 or more images based on guideline commentary that equated each video to 75 images.  This was in error under the intervening decision of *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (*en banc*). Blanc submits that under *Dupree*, the maximum number of images he could be held responsible for is 14 images because under *Dupree*, the 75-image commentary is invalid.  This would reduce Blanc's guideline range from 168-210 months, to a

much lower range of 121-151 months. Accordingly, Blanc seeks reversal.

The Dupree case addressed how to properly apply United States Sentencing Guideline text and its commentary. *Dupree* altered longstanding guideline principles in this Circuit by severely limiting when guideline commentary could be given weight or "deference" in sentencing calculations.

*Dupree's* change had its impetus in *Kisor*, which dealt with the analogous issue of how to interpret executive agency regulations and agency interpretations of those regulations in administrative law. Through a series of cases, the Supreme Court had equated guideline commentary to regulation interpretations. *Id.* Such comparison had carried through from the Supreme Court cases of *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215 (1945); *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905 (1997), and *Stinson v. United States*, 508 U.S. 36, 113 S.Ct. 1913 (1993).

Under these earlier Supreme Court cases, much weight and deference had been given to agency interpretations and guideline

commentary.  However, the Supreme Court made clear that such broad deference to interpretations and commentary was improper because it was the actual regulation or guideline text that was the preeminent authority. Deference to the lesser interpretation was deemed by the Supreme Court to be "a caricature" of proper deference.  *Dupree*, 57 F.4th at 1275, *citing Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019). *Dupree* determined that this new invigorated test was applicable to the sentencing guidelines and its commentary.

In Blanc's case, the guideline at issue is U.S.S.G. §2G2.2(b)(7)(A)-(D), and the improper commentary is found in App. n. 6.  The text of §2G2.2(b)(7) sets out the image table which was used to determine the amount of images in Blanc's case. It states:

> If the offense involved—
> (A) at least 10 images, but fewer than 150, increase by 2 levels;
> (B) at least 150 images, but fewer than 300, increase by 3 levels;
> (C) at least 300 images, but fewer than 600, increase by 4 levels; and
> (D) 600 or more images, increase by 5 levels.

U.S.S.G. § 2G2.2(b)(7).

The text of § 2G2.2 is clear. It simply instructs the court to tally the number of images and then select the corresponding enhancement from the images table.

The commentary in note 6 adds to the guideline in a way that is inconsistent with the text. Note 6 states: "Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." The commentary regarding the number of images pursuant to § 2G2.2 is inconsistent with and adds to the guideline text, and thus is invalid. *See Stinson v. United States*, 508 U.S. 36, 113 S. Ct. 1913 (1993) (guideline commentary invalid if it is inconsistent with or a plainly erroneous reading of the guideline text). If there were any questions under *Stinson* about the invalidity of guideline commentary under § 2G2.2, those questions were put to rest in *Dupree*, 57 F.4th at 1279. The 2G2.2 commentary, n.6 goes beyond any normal interpretative guide, and it is in reality "a substantive legislative rule that belongs in the guideline itself to have force." *Riccardi*, 989 F.3d at 483. Note 6 is an illegal expansion of the § 2G2.2 guideline, and thus, under *Dupree*, it

could not be utilized to calculate the number of images under U.S.S.G. § 2G2.2(b)(7).

Here, the district court erred by applying Note 6 to Blanc's U.S.S.G. §2G2.2 guideline calculation. This error wrongfully increased Mr. Blanc's guideline range from 121-151 months up to 168-220 months. In light of this substantial guideline error, Blanc's sentence was procedurally unreasonable, and it should be vacated and remanded for resentencing.

### B.    Blanc's Sentence Is Substantively Unreasonable.

Mr. Blanc's sentence is also substantively unreasonable. Pursuant to 18 U.S.C. § 3553(a), several factors must be considered in imposing a sentence, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need to avoid unwarranted disparities among defendants; the federal guidelines range; and the need for the sentence to promote respect for the law, provide a just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training and services. 18 U.S.C. § 3553(a); *Gall*, 552 U.S. at 50 n.6; *Kimbrough*, 552 U.S. at 101.

A district court must not only consider the proper factors, but it must also balance those factors reasonably. *Irey*, 612 F.3d at 1189. Moreover, the premise guiding all of these factors is that the sentence should be "sufficient, but not greater than necessary" to comply with its enumerated goals. 18 U.S.C. § 3553(a); *Gall*, 552 U.S. at 50 n.6; *Kimbrough*, 552 U.S. at 101.

Blanc's sentence is substantively unreasonable for several reasons. As explained above, the sentence is harsh and unreasonable in light of the over-sized image enhancement in violation of *Dupree*.

Furthermore, the sentence that Blanc received created unwarranted disparities vis-à-vis other similarly situated defendants as established through national Judiciary Sentencing Information (JSIN) statistics. Based on JSIN, Blanc's sentence far exceeded the national average, and in fact JSIN established that 80% of the defendants across the nation who were similarly situated to Blanc, received a much lower sentence of 104 months. (DE 94:6-7, 23). Therefore, sentencing Blanc to 168 months created unwarranted disparities that made his sentence substantively unreasonable.

Finally, Blanc's sentence was substantively unreasonable because it was based -- in large part -- on uncharged §404(b) conduct and facts that the jury never ruled upon beyond a reasonable doubt. As noted above, the district court attributed 600 or more images to Blanc for his crimes. However, the jury had never ruled on such a number. In fact, the jury verdict had no special verdict form for number of images, and for conviction, the jury only had to find 1 image. Therefore, based solely on the jury's verdict, no image enhancement should have been applied, and Blanc's guideline level should have been reduced to 30,for a guideline range of 97-121 months.

Furthermore, Blanc's uncharged §404(b) evidence played a major role in the sentence. Significantly, the court rejected Blanc's disparity argument because of the uncharged 404(b) case. The court reasoned that the 404(b) case took Blanc's case out of JSIN's national average statistics. Had the court not relied on the §404(b) evidence, it would have considered JSIN's national numbers and imposed a lower sentence.

The court's reliance on the uncharged number of images and the uncharged §404(b) case violated Blanc's fundamental rights that require not only that a jury find every element of a charged crime, but also any fact that increases the punishment for that crime. *Alleyne v. United States*, 133 S.Ct. 2151, 2162 (2013); *Blakely v. Washington*, 542 U.S. 296, 301 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 476-477 (2000).

Although the Supreme Court found that such conduct could be used in an advisory guidelines system, *United States v. Booker*, 543 U.S. 220 (2005), the advisory system did not solve all the constitutional problems with the guidelines. As noted in *Rita v. United States*, 551 U.S. 338 (2007), the *Booker* decision left open the possibility for unconstitutional judicial fact-finding even in an advisory guideline system. *See Rita*, 551 U.S. at 374 (Scalia, J., concurring) ("[t]here will inevitably be *some* constitutional violations under a system of substantive unreasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts"). The concerns raised in *Rita* are present

in Mr. Blanc's case. The district court's reliance on the uncharged 404(b) case was the sole reason it gave to give Blanc a higher than average sentence. Thus, it can "be upheld as reasonable only because of the existence of judge-found facts." *Rita*, 551 U.S. at 374 (Scalia, J., concurring). Blanc's sentence suffers from the constitutional infirmities noticed in the *Rita* concurrence, and it and is substantively unreasonable.

# CONCLUSION

Based upon the foregoing argument and citations of authority, the

Court should reverse Blanc's convictions and sentence.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER


 *s/Margaret Y. Foldes*
Margaret Y. Foldes
Florida Bar No. 83674
Assistant Federal Public Defender
One E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone No. (954) 356-7436
Margaret_Foldes@fd.org

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of FED. R. APP. P. 32(a)(7)(B), because it contains 11,808 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook.

_s/Margaret Y. Foldes_
Margaret Y. Foldes
Attorney for Appellant Blanc
Dated: July 26, 2023

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 26th day of July, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Chief, Appellate Division, United States Attorney's Office, 99 N.E. 4th Street, Miami, Florida 33132 and mailed via U.S. Mail to Mr. Ynddy Blanc, Reg. No. 82651-509, FCI Edgefield, P.O. Box 725, Edgefield, SC 29824.

*s/Margaret Y. Foldes*
Margaret Y. Foldes